IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| RHONDA BACK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:17-cv-00477 |
| | ) | |
| COMMONWEALTH OF VIRGINIA, *et al.*, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Rhonda Back brings this action against her former employer, the Commonwealth of Virginia, and James Granger, her former supervisor. She asserts a claim of sexual harassment and hostile work environment under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, against the Commonwealth, and a claim of assault and battery against the Commonwealth and Granger. (Am. Compl., Dkt. No. 29.) Pending before the court is defendants' motion for summary judgment, seeking judgment as a matter of law on both claims. (Dkt. No. 68.) The motion has been fully briefed and argued. For the reasons set forth below, the court will grant defendants' motion as to Back's Title VII claim and deny the motion as to her state-law claims.

I. BACKGROUND

This action arises out of Rhonda Back's employment with the Virginia Department of Veterans Services (DVS).[1] Back started with DVS on November 25, 2013, as a Veterans

---

[1] DVS is a statutorily created department of the Commonwealth of Virginia.

1

Services Representative in DVS's Salem, Virginia office. She received approximately six weeks of initial training at DVS's Roanoke office before transferring to Salem. (Cates Decl. ¶ 3, Dkt. No. 69-3; Back Dep. 88–89, Dkt. No. 69-4; Granger Dep. 185, Dkt. No. 69-2; Dkt. No. 69-3, Ex. A.) In July 2015, she accepted a promotion to the position of Western Outreach Coordinator in the Wytheville, Virginia office. (Cates Decl. ¶ 4; Back Dep. 90.) James Granger worked for DVS as the Deputy Director of Benefits and as Chief of the DVS Center of Excellence, located in Roanoke. (Granger Dep. 38.) Granger was Back's supervisor until Back transferred to Wytheville, at which point Brandy Disbennett-Albrecht became Back's supervisor. (Disbennett-Albrecht Decl. ¶ 2, Dkt. No. 69-14.)

Except for the first six weeks of Back's employment with DVS, she worked in a different office than Granger. (Granger Dep. 185.) When she moved to the Salem office, she no longer saw Granger daily, but nonetheless continued to see him with moderate frequency because she had to drop off work at the Roanoke office and would see him at trainings and other events. Although she acknowledged that it could have taken just a few minutes to drop off her files, Back nonetheless visited with other DVS employees and often ran into Granger in the process. (Back Dep. 140–43.)

Once Back moved to Wytheville, she would see Granger only when she made occasional trips to Roanoke and during trainings. (*See* Back Dep. 107–08, 158–59 (testifying that she would see Granger when she traveled to Roanoke "[a]t least once a week," when Granger traveled to Wytheville, and during trainings); Burch Decl. ¶ 5, Dkt. No. 69-5 ("[Back] visited [Roanoke] about twice a month . . . . After Ms. Back moved to Wytheville, she would come to

2

[Roanoke] maybe four times a year . . . ."); Dickerson Decl. ¶ 6, Dkt. No. 69-16 ("Ms. Back would come to [Roanoke] once a month while she worked in Salem."); Granger Dep. 193 ("I would see her maybe three, four times a year max . . . . As far as one on one, I saw her once a year.").)

A. **Granger's History of Physical Engagement with DVS Employees**

Granger has a history of physical contact with DVS employees, including hugging and kissing both his fellow supervisors and subordinates. (*See, e.g.*, Disbennett-Albrecht Dep. 48–50, Dkt. No. 70-7 (listing people who Granger hugged and reporting that she saw Granger kiss Jenny White); Sessoms Dep. 20, Dkt. No. 70-10 ("He went around the table and hugged and kissed each female there . . . ."); Wade Dep. 11–15, Dkt. No. 70-11 (naming numerous women Granger hugged and/or kissed); Zirkle Dep. 8–10, Dkt. No. 70-14 (noting that she saw Granger hug and kiss female employees on the forehead, head, and cheek, and saw Granger kiss Candi Wade on the lips).) In fact, when asked about Granger's behavior, some DVS employees commented on Granger's reputation as a "hugger." (*See* Cates Dep. 28–29, Dkt. No. 70-5 (recognizing "that was Jim's nature" and that DVS employees make comments like "that is just Jim" when discussing Granger's hugging); Wilson-Carter Dep. 22, Dkt. No. 70-4 ("[E]verybody said, that is his thing, he was a hugger . . . .").)

In his deposition, Granger explained that he believed that a "kiss or [sic] the forehead, a kiss on the cheek, is one thing," but that a "kiss on the lips is strictly off bounds." He also stated that he has kissed two DVS employees on the lips, though he considered those kisses to be "simply a greeting" and "not a sexual act at all." (Granger Dep. 108, 139.) Granger hugged

3

both male and female DVS employees, but he refused to kiss male employees. (Granger Dep. 106.)

Although some DVS employees described Granger's actions as "fatherly," or "harmless" greetings (*see, e.g.*, Burch Decl. ¶ 3 ("I received hugs from Mr. Granger, and I would describe it like hugging a family member . . . . [The hugs] were fatherly and harmless . . . ."); Cates Decl. ¶ 15 ("I received hugs from Jim Granger as a greeting. I did not feel harassed by these hugs."); Ratcliffe Decl. ¶ 3, Dkt. No. 69-9 ("I . . . received hugs from [Granger] on numerous occasions. Jim and his hugs reminded me of 'a paw paw,' or grandfather. I did not have a problem with the hugs, and in fact liked them."); *see also* Smither Decl. ¶ 4, Dkt. No. 69-6; White Decl. ¶ 5, Dkt. No. 69-7; Williams Decl. ¶ 6, Dkt. No. 69-8), others felt his interactions and comments were inappropriate or made them uncomfortable (*see, e.g.*, Cecil Dep. 13, Dkt. No. 70-6 (reporting that Cecil and Vaughn discussed how Granger's hugging "was kind of uncomfortable"); Disbennett-Albrecht Dep. 66 (indicating it made her "angry" when Granger asked to "go back to her hotel"); Vaughn Dep. 148–51, Dkt. No. 70-1 (describing how Vaughn became upset in response to Granger's kissing); Wilson-Carter Dep. 21–22 ("[H]e did hug me, and . . . I didn't think anything of it, but I thought that it was kind of too much, you know."); Zirkle Dep. 35 ("[I]t took me off guard when I first came aboard, him hugging . . . . [T]hat is just something that I never experienced, and it made me very uncomfortable . . . .").)

Significantly, DVS's management knew about Granger's tendency to interact physically with his coworkers and subordinates. Specifically, Tom Herthel, Director of DVS, and Lisa Cates, Human Resources Director for DVS, had each witnessed Granger's hugging and kissing

4

previously. (*See* Back Dep. 253–54 (reporting that Herthel was standing near Granger when Granger hugged and kissed women at work); Cates Dep. 29–30 (noting that she and Herthel knew of Granger's hugs "[b]ecause it was in front of all of us at the Benefits conference"); Herthel Dep. 49–51, Dkt. No. 70-15 (acknowledging that Granger hugged numerous employees); Sessoms Dep. 17–18 (stating that Herthel and Cates had both been present when Granger would hug and kiss women at work).) Granger also previously kissed Disbennett-Albrecht, who was Back's supervisor after Back transferred to Wytheville. At one point, Granger even told Disbennett-Albrecht that he wanted to see her naked and asked to go to her hotel room. (Disbennett-Albrecht Dep. 60–63.) However, Herthel acknowledged that until June 7, 2017, he never told Granger to stop hugging DVS employees. (Herthel Dep. 55, 74.) Rather, Herthel explained that "lots of folks" in the western part of Virginia "hug each other," while at the same time stating, "that is not something that I'm comfortable with. I don't like personally to be hugged." (*Id.* at 74.)

**B. Granger's Interactions with Back**

Granger's physical interactions with Back started when he hugged Back on her first day with DVS. Back recalled thinking that Granger's hug that first day was "highly inappropriate." (Back Dep. 91–92.) Even after Back began working in Salem, Granger would hug her or kiss her on the cheek or forehead when he saw her. As time went on, his hugs got tighter, and he would hold her for longer. (*Id*. at 92, 136–37, 255.) Granger testified that Back initiated several hugs and that some of the hugs were "mutual." (Granger Dep. 194–95.) Conversely, Back stated that she never initiated a hug because she is "not a hugger of men," but she

acknowledged that she would "wrap [her] arms around him" when he initiated a hug. (Back Dep. 172.)

Back testified that in July 2015, Granger gave her a tight hug and kissed her on the lips. Although Back was "stunned," "immediately upset," and considered the kiss harmful, she did not fear for her safety and did not complain to management. (*Id.* at 126–29, 143–44.) According to Back, several other employees witnessed the kiss. (*Id.* at 127–28 (listing Erin Smither, Jenny White, Melissa Henninger,[2] Candi Wade, and Barbara Smith as witnesses).) Back also reported the kiss to Pam Zirkle and Brittany Dickerson, but she asked Zirkle not to tell anyone about it. (*Id.* at 131–32; Zirkle Dep. 28.) Back testified that when she told Dickerson about her encounter, Dickerson told her Granger also hugged and kissed her. (Back Dep. 132.)

However, Granger disputes that he ever kissed Back on the lips (Granger Dep. 194–95), and Back's alleged witnesses do not remember seeing Granger kiss Back (Smither Dec. ¶ 7; White Dec. ¶ 9; Wade Dep. 19; Smith Dec. ¶ 5, Dkt. No. 69-12). Additionally, Dickerson stated that she "never saw Mr. Granger give Ms. Back a kiss on the lips, nor did Ms. Back ever tell me about such an event." (Dickerson Decl. ¶ 7.)

On June 7, 2017, Herthel told Granger to stop hugging DVS employees after receiving complaints of sexual harassment involving Granger and another employee, Rashaan Vaughn. (Herthel Dep. 55.) Nonetheless, Granger, who believed Herthel's instruction was "petty" (Granger Dep. 170), continued hugging DVS employees and, on around June 28 or 29, gave

---

[2] Back actually reported that "Melissa Vandenberg" witnessed the kiss, but she later corrected herself. (*See* Pl. Mem. Opp'n 9 n.10, Dkt. No. 70.)

Back a tight hug and kissed her on her cheek or forehead.  (Back Dep. 133–34; Sessoms Dep. 21.)  According to Back, Granger told her "this is your no hug hug."  (Back Dep. 133.)  After the meeting concluded, Back and Granger went to lunch together.  (Williams Decl. ¶ 5; Granger Dep. 196–97 (testifying that Granger took Back to lunch after his last meeting with her).)  Back did not see Granger again before he retired in July 2017.[3]  (*Id.* at 27.)

**C. Back Reports Granger's Behavior to DVS and the EEOC**

In June 2017, DVS began investigating allegations of sexual harassment involving Vaughn and Granger.  (Herthel Dep. 66–67, 75–76.)  As part of that investigation, on July 19, 2017, Donna Williams, the acting chief of the DVS Roanoke office, interviewed Back about Vaughn's allegations against Granger.  Back reported Granger's hugs and kisses on the cheeks and lips to Williams.  (Back Dep. 177–78, 203; Williams Decl. ¶ 4.)  Although Back had previously discussed Granger's behavior with other DVS employees, this was the first time Back reported Granger to management.[4]  (Back Dep. 177, 251 (indicating this was the first time Back told DVS the hugs had bothered her).)

On July 25, 2017, Back filed her charge of discrimination with the EEOC against DVS.  (Dkt. No. 69-3, Ex. G.)

---

[3] Herthel testified that as he investigated allegations from Vaughn, he gave Granger the choice either to work in Richmond, away from his Roanoke DVS office and employees, or to retire.  Granger chose to retire.  (Herthel Dep. 73.)

[4] Defendants note, however, that Back was quick to report other instances of rumored misconduct.  (Mem. in Supp. 6.)  For example, Back reported to Disbennett-Albrecht that a coworker had been fired from a previous employer for sexual harassment, although that turned out to be untrue.  (Back Dep. 211–13.)

**D. DVS's Response to Back's Report**

In response to complaints of sexual harassment, Herthel sent an e-mail to DVS's benefits department implementing a "no hugging" policy on July 31, 2017. (Cates Decl. ¶ 10; Dkt. No. 69-3, Ex. H.) The parties dispute whether the language of the policy—which used phrases like "Yup, you read that correctly" and "I don't expect our RD's to be the 'hugging police'"—was intended to be a serious policy or was instead aimed at mocking the employees who reported Granger's behavior as sexual harassment. Herthel and Cates then interviewed Back on August 7, 2017, about her complaint, asking what they "could do to remedy the problems she was claiming, since Mr. Granger was the subject of Ms. Back's complaints, and he had already retired." (*Id.* ¶ 11.) According to Cates, Back responded that she wanted to continue working but did not want any further contact with Granger. (*Id.*; Back Dep. 250–51.)

Approximately one week after the interview, Back's supervisor, Disbennett-Albrecht, reached out to Back to ask if she needed anything. Back replied that she did not. (Disbennett-Albrecht Decl. ¶ 9.) However, the following day Back expressed concern to Disbennett-Albrecht that Herthel was mad about Back filing a complaint. Disbennett-Albrecht assured Back that was not the case. (*Id.*)

In November, Herthel held a conference call during which he told DVS employees to remain professional and not to retaliate against individuals who were pursuing litigation against DVS. (Dkt. No. 75-3.) Back took issue with conference call, claiming that Herthel handled the situation poorly by announcing the lawsuit to the agency and that it became a source of stress for her. She explained that DVS management told her not to discuss the lawsuit with anybody at

8

DVS but then did "exactly what they told me I was not allowed to do." However, she also acknowledged that Herthel gave everyone, including Back, the same instruction—to remain professional and avoid discussing the lawsuit. (Back Dep. 28–32.)

**E. Back Takes Medical Leave**

After the conference call in November 2017, Back left work on "short-term disability," at which time she engaged in therapy and took medication for anxiety. She remained out of work until January 18, 2018. (*Id.* at 10–11.) Back testified that upon returning to work in January, she faced "a combination of a lot of stress," including people talking about her at work. (*Id.* at 41.) Among other things, she noted that Fred Beebe, a fellow DVS employee, said she "thought too highly of herself" and "mocked the 'no hug hug' numerous times.'" And, at a training, when Tom Holley stood up to receive an award, he said "don't hug me." (*Id.* at 43.) Although Beebe was reprimanded, and Back noted that the teasing stopped, she also testified that things did not improve. (*Id.* at 49–50.) In November 2018, Back again took short-term disability and has not returned to work since. (*Id.* at 41.)

Back alleges that Granger's behavior—and the Commonwealth's knowing failure to act regarding it—created a hostile work environment and caused her harm. She also alleges that Granger's actions placed her in apprehension of, and subjected her to, unwanted and harmful or offensive contact constituting assault and battery, for which she seeks to hold both Granger and the Commonwealth liable.

9

II. DISCUSSION

A. **Summary Judgment Standard**

Under Rule 56, summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Id.* at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50). "While courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958–

59 (4th Cir. 1996).

## B. Title VII Claim

Title VII prohibits practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To establish a claim for sexual harassment under Title VII, a plaintiff must prove that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Commonwealth of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) (en banc); *see Boyer-Liberto v. Fountainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). Because Back has produced insufficient evidence to show that she suffered harassment severe or pervasive enough to alter her the conditions of her employment and create an abusive work environment, the court will dismiss her Title VII claim.

"[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "Whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position." *Boyer-Liberto*, 786 F.3d

at 277 (internal quotations omitted). The court may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 510 U.S. at 23). The plaintiff can also introduce evidence of other instances of harassment of which she was not aware to show that the workplace was objectively hostile because it is "highly probative of the type of workplace environment she was subjected to, and whether a reasonable employer should have discovered the sexual harassment." *Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 802 (8th Cir. 2009); *see also Bellofatto v. Red Robin Intern., Inc.*, No. 7:14CV00167, 2014 WL 7365788, at *7 (W.D. Va. Dec. 24, 2014). While "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test," at the summary judgment stage, the court's task "is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion." *Equal Emp't Opportunity Comm'n v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316–17 (4th Cir. 2008).

Looking at the record here, no reasonable jury could find that Back's workplace was objectively hostile. "Not all sexual harassment that is directed at an individual because of his or her sex is actionable. Title VII does not attempt 'to purge the workplace of vulgarity.'" *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). In *Hopkins*, the Fourth Circuit considered a case where "the incidents that Hopkins recount[ed] occurred intermittently over a seven-year period, with gaps between incidents as great as a year." *Id.* The court noted that the frequency alone "suggests the absence of a condition sufficiently pervasive to establish Title VII liability."

12

*Id.*; *see also Baskerville*, 50 F.3d at 431 ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."). The Fourth Circuit also found the conduct was not severe or pervasive even though the alleged harasser gave the plaintiff a congratulatory kiss at his wedding. *Hopkins*, 77 F.3d at 753.

Also persuasive here is the Western District of North Carolina's decision in *Joiner v. Wal-Mart Stores, Inc.*, 114 F. Supp. 2d 400 (W.D.N.C. 2000). There, the plaintiff faced "unwanted propositions and hugs and kisses" from coworkers. *Id.* at 407. He testified that the most offensive conduct he suffered was when a female coworker grabbed him, gave him a "big hug," and kissed him on the cheek. Yet, he never told the coworker that he did not want her to hug him. The court found that "Plaintiff's claims of unwelcome kisses on the cheek and hugs do little to further his claim, inasmuch as he admits that he did not say 'no' or in any other way indicate that such demonstrations were not welcome." *Id.* at 408–09 ("It simply is not illegal to flirt in the workplace, to hug in the workplace, or even kiss in the workplace. These are very ordinary things that people do and are not *per se* intimidating, hostile, humiliating, or offensive."); *see also Atkins v. Computer Scis. Corp.*, 264 F. Supp. 2d 404, 411 (E.D. Va. 2003) (finding that conduct "including full body hugs, pressing her breasts against plaintiff, demanding after hours meetings, and exposing her thighs to plaintiff" was not severe or pervasive when there were no "sexually-oriented comments" and the defendant did not directly proposition the plaintiff for sexual favors).

Back asserts that Granger hugged her most times he saw her, if not every time, including on her first day of work at DVS. He also kissed her on the cheek or forehead at times and

13

kissed her on the lips once in 2015. But, after the first six weeks of her employment, Back moved to a different office where she saw Granger much less frequently. In fact, the evidence shows that since she moved to the Wytheville office in 2015, Back has seen Granger only approximately four times a year. As in *Hopkins*, the infrequency alone of the alleged harassment suffered by Back belies her claim that she suffered "pervasive" hostility. *See also Byers v. HSBC Fin. Corp.*, 416 F. Supp. 2d 424, 435 (E.D. Va. 2006) (finding that the alleged conduct was not severe or pervasive where it did not occur daily, did not involve sexual discussions or comments, was not forceful or physically threatening or humiliating, and instead enhanced the plaintiff's work performance).

Additionally, as to the subjective prong, the evidence shows that, like in *Joiner*, Back did not experience severe, physically threatening, or humiliating harassment. Although she testifies now that she was upset by Granger's kiss and the longer, tighter hugs she received later in her time with DVS, she admitted that she never expressed her displeasure with the contact to Granger or DVS management. Notably, however, the evidence shows that Back was quick to report other DVS employees for unsubstantiated rumors. Her coworkers also testified that when they saw Granger hug Back, she never seemed uncomfortable. Even Back acknowledged that when Granger hugged her, she would wrap her arms around him. Moreover, Back admitted that when she would visit the Roanoke office, she could have completed her work and left, but chose instead to visit everyone, exposing herself to additional interactions with Granger. Certainly, had she considered Granger's conduct severe and offensive, she would not have continued visiting his office knowing that he hugged her on most occasions when he saw her.

Similarly, Back's willingness to visit with other DVS employees in Granger's office bolster's defendants' argument that the alleged harassment did not alter the terms or conditions of Back's employment. Although Granger's actions reportedly made Back uncomfortable, they did not prompt Back to change how she approached her visits to the Roanoke office. Moreover, she performed satisfactorily at her job and ultimately received a promotion.

Back cites to *Crockett v. Mission Hospital, Inc.*, No. 1:11cv95, 2012 WL 2576461 (W.D.N.C. July 3, 2012), for the proposition that "kissing [is] severe." Her reliance is misplaced. In *Crockett*, the court outlined a series of facts indicating that Crockett's harasser singled her out, led her to a room so they could be alone, pressured her into lifting her shirt, and threatened her job if she did not comply. The evidence showed that the plaintiff was in tears during the interaction and believed her job was in danger. Although her harasser ultimately gave her a hug and kissed her cheek, his actions went well beyond that. *Id.* at *3. Back simply did not suffer the same level of harassment at DVS.[5]

Without more, Back has not identified facts that establish harassment that was severe or pervasive enough to alter the terms or conditions of her employment.[6] No reasonable jury could find that DVS is liable for Granger's behavior under Title VII. Accordingly, the court will

---

[5] It is unclear whether Back intends to rely on *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202 (4th Cir. 2014), to support her argument as to objective or subjective hostility. To the extent she suggests *Walker* supports a finding that her work environment was subjectively hostile, she is similarly off-base. While she correctly states the Fourth Circuit's observation that comments made by a plaintiff's coworkers "paint[ing] women in a sexually subservient and demeaning light" could prove hostility, the evidence in Back's case just does not support such a finding. *Id.* at 210. Among other things, Back did not suffer the same frequency or severity of harassment as that shown in *Walker*.

[6] The court acknowledges that hugs and kisses may, in certain circumstances, create a hostile work environment. *See Zetwick v. County of Yolo*, 850 F.3d 436, 443 (9th Cir. 2017). However, Back has failed to establish that Granger's conduct was severe or pervasive enough under the specific circumstances of her claim.

dismiss Back's Title VII claim and need not consider the remainder of the parties' arguments as to that count of Back's amended complaint.[7]

## C. State Tort Claims

Back further seeks to hold Granger and the Commonwealth liable for assault and battery under Virginia common law. Finding that there remain questions of fact, the court will deny DVS's motion for summary judgment as to Back's state-law claims.[8]

### 1. James Granger

Viewed in the light most favorable to plaintiff, the evidence supports a reasonable inference that Granger committed an unwanted touching that caused harm or offense. Since October 2015, Granger hugged Back and kissed her on the cheek whenever he saw her at DVS or trainings, and Back testified that these hugs and kisses were unwanted. A reasonable jury could find that Granger intended to cause offensive contact and that Back reasonably apprehended an imminent battery. Although it is unclear to what extent Back was injured by or consented to

---

[7] Back further asserts that she was constructively discharged when DVS "forced [her] out on medical leave" by its "repeated actions." (Pl. Mem. Opp'n 20.) Back specifically takes issue with the conference call in which Herthel asked DVS staff not to discuss the pending litigation and comments made by coworkers after DVS instituted its "no hugging" policy. She further alleges that her coworkers teased her about the no hugging policy; however, the evidence shows that DVS management addressed this behavior. Notably, however, Back has not asserted a claim for retaliation. Rather, she relies on her alleged constructive discharge to overcome DVS's defense under *Faragher*, 524 U.S. 775, and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). Accordingly, because the court will dismiss Back's Title VII claim, it need not consider DVS's affirmative defense or Back's allegations of constructive discharge.

[8] Significantly, as defendants point out, the two-year statute of limitations created in Virginia Code § 8.01-243 bars recovery for actions taken between Back's start at DVS and October 2015. Thus, the court will consider only those actions taken within two years of Back's filing. Because Granger kissed Back on the lips in July 2015, that act cannot form the basis of Back's state-law claims.

Granger's hugs and kisses,[9] Back has pointed to sufficient evidence to create a dispute of fact regarding her assault and battery claims, and the court will deny summary judgment as to the claims against Granger.

## 2. The Commonwealth of Virginia

Having established that the assault and battery claim goes forward as to Granger, the court turns to Back's claim against the Commonwealth under the doctrine of *respondeat superior*.

In her amended complaint, Back alleges that "Granger used his power and authority as plaintiff's superior to carry out the assaults and batteries described herein," and that the "acts of defendant James Granger, Sr. constitute assault and battery under the common law of the Commonwealth of Virginia, for which defendants Commonwealth of Virginia and James Granger, Sr. are liable under Virginia law." (Am. Compl. ¶¶ 31–32.) The Commonwealth argues that Back failed to allege the elements of vicarious liability and that Granger was not acting within the scope of his employment. (Mem. in Supp. 21 n.4; Reply 23–25, Dkt. No. 75.)

Notwithstanding the fact that this case is now at the summary judgment stage, because the Commonwealth argues that Back's allegations in her amended complaint are insufficient, the

---

[9] Granger and DVS both assert that Granger acted with apparent consent. Because Back never protested or expressed her discomfort when Granger hugged or kissed her, they contend Granger reasonably believed that Back consented to receiving hugs and kisses. (Mem. in Supp. 23–24 (citing *Marcantonio v. Dudzinski*, 155 F. Supp. 3d 619 (W.D. Va. 2015)).) *See also* Restatement (Second) of Torts § 892 (Am. Law Inst. 1975) ("If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact."). However, Back has testified that the contact was unwanted and has also pointed to testimony by other DVS employees who stated that even though Granger's conduct made them uncomfortable, they went along with it because that was the atmosphere cultivated at DVS. Moreover, other DVS employees expressed their distaste with Granger's conduct, putting him on notice that his hugs and kisses may be offensive. Thus, a reasonable jury may find that Granger could not reasonably understand Back's conduct to constitute consent.

court will look to what is required to state a claim. Under the Federal Rules of Civil Procedure, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff meets the pleading standard of Rule 8(a) if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007)). Under Virginia law, "an employer is liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 145 (4th Cir. 2018) (quoting *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 174 (Va. 1996)).

Under these standards, the court concludes that Back has adequately alleged that the Commonwealth is liable under the doctrine of *respondeat superior*. Stating that "Granger used *his power and authority as plaintiff's superior to carry out the assaults and batteries* described herein," and that the "acts of defendant James Granger, Sr. constitute assault and battery . . . for which defendants Commonwealth of Virginia and James Granger, Sr. are liable under Virginia law," Back satisfied the pleading standard. (Am. Compl. ¶¶ 31–32 (emphasis added).) Regardless, at the summary judgment stage, the court must look to whether there is a genuine dispute of material fact, not whether Back has satisfied the pleading standard.

Turning to the substance of Back's allegations against the Commonwealth, there is a dispute of material fact as to whether Granger was acting within the scope of his employment when the tortious acts were committed. The heart of this inquiry is "whether the service itself,

18

in which the tortious act was done, was within the ordinary course of [the employer's] business." *Lacasse v. Didlake, Inc.*, 712 F. App'x 231, 236 (4th Cir. 2018) (quoting *Gina Chin & Assocs., Inc. v. First Union Bank*, 537 S.E.2d 573 (Va. 2000)). Here, a reasonable jury could find that Granger used his supervisory position at DVS to hug all the employees and kiss some of them, and that DVS allowed him to engage in this behavior. Thus, the facts do not conclusively establish that Granger was acting outside the scope of his employment when he allegedly committed assault and battery against Back, and the court will therefore deny summary judgment on Back's claim against the Commonwealth for assault and battery.[10]

### III. CONCLUSION

For the foregoing reasons, the court will grant in part and deny in part defendants' motion for summary judgment. Specifically, the court will grant summary judgment as to Back's Title VII claim and deny summary judgment as to her state-law claims. A separate order will be entered.

Entered: November 27, 2019.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge

---

[10] The court acknowledges that its sole basis for jurisdiction over Back's state-law claims is supplemental jurisdiction under 28 U.S.C. § 1367. However, the court may nonetheless retain jurisdiction and finds that the factors of judicial economy, convenience, and fairness weigh in favor of retaining Back's claim. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (noting that the factors to be considered in retaining pendant jurisdiction include "judicial economy, convenience, fairness, and comity"). The parties have engaged in substantial discovery and preparation, and trial is scheduled for January 2020. To dismiss the case at this late stage would be unfair and inconvenient to the parties and would waste judicial resources by forcing Back to start from scratch in state court.